The following constitutes the
Memorandum Decision of the Court.
Signed October 7, 2016

_____

Roger L. Efremsky
U.S. Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

In re:                                Case No. 14-42018 RLE

                                      Chapter 7

MATTHEW THOMAS CASTRO,

        Debtor.
_____/

JOHN STIRTON and
BONITA INVESTMENTS, LLC,               Adv. Proc. No. 14-4115 RLE

        Plaintiffs,

v.

MATTHEW THOMAS CASTRO, aka
MATT CASTRO, dba BAY VALLEY
REALTY, aka BV PROPERTY
MANAGEMENT,

        Defendant.
_____/

**MEMORANDUM DECISION AFTER TRIAL**

-1-

On August 18, 2014, John Stirton ("Stirton") and Bonita Investments, LLC ("Bonita" and, together with Stirton, "Plaintiffs") timely filed a Complaint against defendant Matthew Castro ("Castro"), seeking a non-dischargeable judgment pursuant to Bankruptcy Code §§ 523(a)(2)(A), (a)(4) and/or (a)(6). This court held a trial on the Complaint over a four-day period between October 13, 2015, and October 16, 2015. At the conclusion of trial, the court requested post-trial briefs from the parties. The post-trial briefs were filed on February 1, 2016. Plaintiffs followed up their post-trial brief with an *Errata* on February 3, 2016. Thereafter, the matter was taken under submission. This Memorandum Decision constitutes this court's findings of fact and conclusions of law under Fed. R. Bankr.P. 7052.[1]

## II. Factual Background

As an initial matter, this section is intentionally brief and general. The brevity is made necessary by Stirton's failure (on behalf of Plaintiffs): (1) to establish a coherent timeline of events; (2) to recall the events that underlie the complaint in this case; and (3) to testify consistently regarding various events.[2] While Castro's testimony suffered from similar defects,

---

[1] The following abbreviations will be used: "Tr." indicates the trial transcript; "Exh." indicates exhibit.

[2] The court expressed its frustration with Stirton's inability to recall events and/or testify consistently on various occasions. See, e.g., Tr. Day 1 at 59:5-15 ("So, Mr. Stirton, . . . I'm going to admonish you in your testimony. If you're not sure you understand your attorney's question or anybody's question to you, make sure you understand the question before you answer it. Also, if you're not sure and you want to think about

Case: 14-04115   Doc# 50   Filed: 10/07/16   Entered: 10/07/16 15:27:25   Page 2 of 31

his deficiecies are less meaningful as he did not have the burden of proof at trial.  Grogan v. Garner, 498 U.S. 279, 291 (1991).

**John Stirton**

Stirton is highly educated, with an undergraduate degree in psychology, and a minor in mathematics from the University of California Davis.  After approximately twelve years working in the electronics and telecommunications industry, he went back to school and earned a degree in mathematics from San Jose State University.  Tr. Day 1 at 6:13-7:9.  His work experience was primarily in telecommunications and consisted largely of test engineering, designing fixtures, product testing and helping in product development and programming.  Tr. Day 1 at 7:10-8:16. While Stirton himself has no background in real estate, finance, or law, his wife is a legal secretary who, at the time of trial, had been working as such for over 25 years.  Tr. Day 1 at 8:17-

---

it, take your time and think about it. But when you come back and you answer a question one way and then later on, because maybe you've flipped a page or two and you look at it differently, you change your testimony, not only does it affect your credibility, but it makes it very difficult to follow the case"); see also, Tr. Day 1 at 61:7-10 ("We're talking about these documents, not something that might look like it.  So that [sic] if you're not sure about this, it's very critical that you just simply say, I'm not sure"); Tr. Day 1 at 72:11-23 (Court: "[I'm] not clear in my mind that you were clear.  And what's really critical here that I have to get at is what representations, if any, that Mr. Castro made to you versus something you may have assumed that was not specifically represented to you."  Stirton: "The representation would have been that he was getting much greater returns from this investment and that he - - ."  Court: "What investment? Specifically, what investment?"  Stirton: "That would have been – that's a good question, because I'm not really clear on what the investment was"); Tr. Day 1 at 128:25-129:5 ("[T]he story is changing. . . . [F]rankly, I find Mr. Stirton's recollection to be very poor and it's not easy to follow the story.")

-3-

1  9:21.

2      Prior to meeting Castro, Stirton had invested over $100,000
3  with an investment counselor named Gregory Hannah ("Hannah").[3]
4  Tr. Day 1 at 10:6-20.  When the market declined in 2008 and 2009,
5  however, Stirton withdrew his funds from the investments he had
6  with Hannah.  Tr. Day 1 at 11:3-7; 150:1-3.  At some point
7  subsequently, Hannah informed Stirton that Castro was "flipping"
8  houses for profit and Hannah suggested that Stirton meet with
9  Castro.  Tr. Day 1 at 10:22-11:4.  Stirton then contacted Castro
10 to express his interest in investing in flipping projects.  Tr.
11 Day 1 at 11:5-7; 11:24-12:8; Tr. Day 3 at 57:23-25.

12     **Matthew Castro**

13     Castro holds an undergraduate degree in Business Management
14 from St. Mary's College of California.  Tr. Day 3 at 49:3-7.
15 Along with working as an account manager and sales person for
16 Alameda Electrical Distributors, Castro is an employee and owner
17 of his sole proprietorship, Bay Valley Realty ("Bay Valley") and
18 a 51% partner in Bay Valley Property Management.  Tr. Day 3 at
19 49:10-50:9.

20     Bay Valley was first established in 2005 and, at the time of
21 trial, Castro was the broker and had one broker associate and

22

23      [3]Stirton testified that he met Hannah when Hannah was a
   speaker at a technical professional job search group that Stirton
24 was a member of.  Tr. Day 1 at 148:3-8.  Stirton says he found
   Hannah to be credible, but never personally verified any of
25 Hannah's credentials; instead, relying on the fact that Hannah
   had "certificates," had been "doing investments for a long time,"
26 "had the degree on the wall and, you know, he was authorized --
   he was dealer [sic] -- or an investment broker for Transamerica
27 Corporation," and "there was a wide range of people who I met who
   had testified to his authenticity." Tr. Day 1 at 148:9-149:3.
28

                              -4-

three licensed realtors working for him.  Tr. Day 3 at 50:10-51:12.  Between 2010 and 2015, Castro estimates that Bay Valley had done an estimated 300 flipping projects with Castro acting as the broker.[4]  Tr. Day 3 at 51:16-21; 54:2-4.

### Stirton's Flipping Projects Via Bay Valley

Between 2010 and 2012, Stirton, through his LLC, Bonita,[5] invested in three flipping projects via Bay Valley.  Tr. Day 1 at 12:11-15.  Stirton was "hands off" in the flipping projects and admits to doing very little due diligence on his own, instead deferring to Castro and Bay Valley's expertise in real estate. Tr. Day 1 at 15:4-23; 152:17-25; 164:22-165:17.

In the preliminary discussions with Castro regarding these flipping projects, Stirton said that Castro told him the return on investment would be in the 20-30% range.  Tr. Day 1 at 16:25-17:5.  While Stirton only realized a return of somewhere between 2% and 22% on each of the three flipping projects, he testified

---

[4]Castro and Stirton both testified that the way that these flipping projects were structured was that Bay Valley's licensed realtors (through their respective individual LLCs) would purchase a property and investors would work directly with the LLC to fund and complete the flip of the property.  Castro had no ownership interest in Bay Valley's realtors' LLCs and his role in these flipping projects was simply to act as the broker for the seller once the property was ready to be re-sold.  Tr. Day 1 at 15:4-16:7; pp. 157-162, generally; Tr. Day 3 at 52:2-54:7. Castro did, however, receive funds on top of his commission as a broker if he brought in his own investors.  Tr. Day 3 at 54:8-11.

[5]Stirton testified that at or around the time of the first flip, Castro told him that a LLC was necessary to protect Stirton from personal liability from any lawsuits brought as a result of the flipping project.  Stirton also testified that Castro assisted Stirton in forming Bonita.  Tr. Day 1 at 22:5-19. Castro denies that he provided any such advice or assistance. Tr. Day 2 at 142:9-14.

-5-

that the actual returns gave credibility to the flipping projects undertaken by Bay Valley and its realtors and that, as a result, Stirton had a lot of confidence in Castro.[6]  Tr. Day 1 at 23:25-24:10.

### James Wolfe and Revenue Generation Technologies

At some point in late-2009 or early-2010, Castro's home was going into foreclosure and he was introduced to a woman named Lori Arzamendi ("Arzamendi")[7] who referred Castro to a company called Home Support Group ("HSG").  Tr. Day 2 at 128:14-129:4; Tr. Day 3 at 62:21-22.  HSG was described as an entity that endeavored to assist underwater homeowners by modifying their existing loans, or by purchasing the property and leasing it back to the homeowner for a period of time until the homeowner was in a position to repurchase the property (the "HSG Model").  Tr. Day 3 at 61:3-62:20.  Although the HSG Model was unsuccessful in Castro's case, and he ultimately lost his house to foreclosure, he became and remained friendly with Arzamendi.  Tr. Day 2 at 132:8-133:16; Tr. Day 3 at 66:8-14; 67:23-68:5.

Castro testified that in the latter part of 2012, Arzamendi told Castro that she wanted him to meet a gentleman named James

_____

[6]Interestingly, Stirton acknowledged that he knew that Castro's projections for a 30% return were unlikely.  Tr. Day 1 at 24:4-8 ("The information that was given to me seemed valid and appropriate, and [Castro] seemed to hold up on his word, that his projections were correct in every case.  I mean, outside the fact that we were never going to make 30 percent on a number of those, or I didn't foresee us doing that[.]").

[7]Castro was introduced to Arzamendi by Leo Montoya, a man described by Castro as a "mentor" who had worked for the FBI for 35 years prior to retiring.  Tr. Day 2 at 134:21-24.

-6-

Wolfe ("Wolfe"), who was also allegedly involved with HSG.  Tr. Day 3 at 68:6-9; 69:22-70:2.  Castro testified that Arzamendi spoke very highly of Wolfe, allegedly representing to Castro that Wolfe seemed to be a good businessman, had "contacts", went to Michigan State, was part of the Magic Johnson Foundation, served in the Gulf War, and considered Colin Powell to be a mentor.  Tr. Day 3 at 68:16-69:1.

Castro testified that he met with Wolfe multiple times in early to mid-2013.  During these meetings, Castro learned about Wolfe's company, Revenue Generation Technologies ("RGT") and about various aspects of RGT's business from Wolfe and from others Castro met at the meetings.  Castro recalled being very impressed with Wolfe and his operation and being left with the impression that RGT had experienced success in its various endeavors.[8]  Tr. Day 3 at 70-89, generally.  Castro testified that at some point during the course of these meetings, he came to understand that Wolfe wanted Castro to help find investors to invest capital in RGT.  Tr. Day 3 at 82:21-83:21; 88:11-14.

/ / / /

/ / / /

/ / / /

/ / / /

---

[8]While Castro recited various aspects of RGT's alleged business, it was clear that he understood very little, if anything, about any of it, including whether RGT made money, and if so, how.  Instead, it appeared to the court that Castro was more impressed at the appearance of legitimacy portrayed by Wolfe's office and the alleged contacts.

Case: 14-04115   Doc# 50   Filed: 10/07/16   Entered: 10/07/16 15:27:25   Page 7 of 31

**The "Investments"[9] at Issue**

Stirton testified that in early 2013, he was holding funds in Bonita's bank account from the three flipping projects with Bay Valley and from the sale of his residence. Tr. Day 1 at 21:23-22:3. Stirton wanted to invest the funds so he and a colleague started looking for properties to flip on their own. They were unsuccessful, however, as the market had started to recover and prices on real properties were trending upward. Tr. Day 1 at 20:17-21:22.

In late May of 2013, Stirton met with Castro multiple times and expressed his interest in additional flipping projects or real estate investments. Tr. Day 1 at 24:11-29:12. Stirton testified that during the course of these meetings, Castro told Stirton that the market had changed and that there were no longer flipping opportunities, but that Castro had recently been introduced to Wolfe and RGT, and that RGT was a new company and "investment model" that Castro had been looking into. Tr. Day 1 at 176:1-7; Tr. Day 2 at 5:10-6:2. Stirton further testified that Castro told Stirton about Wolfe's alleged connections, shared his impressions of Wolfe, provided a copy of Wolfe's LinkedIn bio and told Stirton that Wolfe was claiming that RGT

---

[9]The court uses the term "investment" very loosely to describe the transactions at issue in the Complaint and only does so because that is how the parties described them. The testimony and evidence was clear, however, that the transactions were nothing more than unsecured loans. See, e.g., Tr. Day 2 at 193:10-196:18; Tr. Day 3 at 11:12-16:20 (Castro's confusion regarding whether the transactions were capital investments or loans and ultimate acknowledgment that "investments" were, in fact, loans).

-8-

was getting returns of over 18% on its investments.[10]  Tr. Day 1 at 49:21-50:9; 99:3-11; Tr. Day 2 at 6:3-11.  Stirton testified that he told Castro that the RGT "investment model" seemed risky and that he could not afford to lose his investment.  Tr. Day 1 at 76:5-14.  Castro testified that in response, he told Stirton to perform his own due diligence and not to invest if he did not feel comfortable.  Tr. Day 4 at 13:20-14:12; 50:7-20.

Stirton testified that he attempted to research Wolfe and RGT via Google and LinkedIn, but was unable to find much information.  Tr. Day 1 at 99:18-100:16; 174:2-4.  Stirton admitted that he never met Wolfe and never asked to meet Wolfe, but acknowledged that "it might have been a good idea."  Tr. Day 1 at 86:20-87:2.  Castro testified that Stirton never asked him to get any additional information from RGT or Wolfe regarding potential investments, never asked whether Castro had looked at profit and loss statements, and never asked if Castro had received any literature or written documents from RGT.  Tr. Day 3 at 125:14-22.

Despite having virtually no facts about Wolfe and RGT and

---

[10]At trial, Stirton admitted that Castro never represented that he had done any independent investigation of Wolfe or RGT and never actually vouched for RGT, but Stirton got the impression that Castro was vouching for Wolfe and RGT because Castro had "met with the people and knew the people."  Tr. Day 1 at 174:23-175:9; 183:19-184:24.  Stirton also acknowledged that Castro never represented that he was personally getting any returns from RGT and that Stirton understood that Castro had not personally invested in RGT, allegedly because he did not have the funds to do so.  Tr. Day 2 at 6:13-21.

Case: 14-04115   Doc# 50   Filed: 10/07/16   Entered: 10/07/16 15:27:25   Page 9 of 31

only the vaguest grasp of the investments Castro had described[11], Stirton agreed to cause Bonita to make an investment.[12]

Stirton testified that instead of Bonita investing directly with RGT, however, Castro proposed, and Stirton agreed, to invest indirectly through Castro's Nevada limited liability company, Source Solutions Group, LLC ("SSG")[13]. Tr. Day 1 at 67:14-69:10; 185:21-23. In essence, SSG would act as a "middleman," collecting funds from Bonita and others[14], and transferring those

---

[11]Tr. Day 1 at pp. 29-52; 65-75, generally (Stirton's inconsistent and incomplete understanding of the various investment models described by Castro).

[12]Stirton testified that he ultimately decided to invest because "I wanted to continue, you know, to have a relationship with Mr. Castro based on the past investment. That I had a great deal of confidence and trust in him and that I thought it was a, you know, a credible idea in general, although I -- it occurs to me in my testimony I'm unclear on the specifics, on the overall concept of the idea of this package it sounded okay, and his assurances that it would -- it was solid, you know." Tr. Day 1 at 75:9-20. Stirton's true motivation was revealed, however, when he testified, "In fact, this [investment] was a way to reach a level of investment with [Castro] that he [sic] could possibly do something like a flip with in the long run." Tr. Day 1 at 77:24-78:2.

[13]Castro testified that when he originally formed SSG, he was working with HSG in an attempt to assist other underwater homeowners in keeping their homes and intended to deposit any commissions received as a result of services performed for HSG, in SSG's account. He further testified that when he formed SSG, he did so in Nevada because he believed it would result in tax advantages and thought he could also use SSG for other business ventures in the future. Tr. Day 2 at 147:1-148:16; 151:16-152:6; 158:14-159:7; 162:5-163:6; Tr. Day 3 at 131:18-132:5. Castro was aided in forming and running SSG by an entity called Corporate Nevada. Tr. Day 3 at 125-131, generally.

[14]Stirton testified that prior to transferring any funds to SSG, Castro told Stirton that Castro had other clients that were also investing with RGT on similar terms. However, Stirton

-10-

funds to RGT. Then, based on an agreement between RGT on the one hand, and SSG on the other, RGT would pay a return on investment to SSG[15] and, via a separate agreement between SSG and Bonita, SSG would pay a smaller return on investment to Bonita. See generally, Tr. Day 1 at 74:13-75:8; 85:1-13; 186:5-187:11. Stirton testified that the transactions were structured this way because Castro was brokering the investment deals with his personal contacts and therefore, was going to get a higher rate of return on the investments.[16] Tr. Day 1 at 85:1-9.

On June 11, 2013, Stirton caused Bonita to wire $100,000 to SSG's bank account. Pl. Exh. 7. Two days later, on June 13, 2013, Stirton caused Bonita to wire an additional $25,000 to SSG's bank account, for a total investment of $125,000 (the "First Investment"). Pl. Exh. 7; Tr. Day 1 at 93:9-24. The

---

testified that Castro never provided the names and number of any such investors. Importantly, it does not appear that Stirton ever specifically asked for this information. Tr. Day 1 at 116:20-118:1; 119:8-11; Tr. Day 2 at 190:11-13. Castro denied that he ever represented to Stirton that there were any other investors and testified that when Stirton transferred funds to SSG, Castro intended to find more investors. Tr. Day 2 at 190:5-15; Tr. Day 3 at 135:23-136:1.

[15]The promissory note between RGT and SSG was dated June 10, 2013 (although allegedly not signed until June 12, 2013), and provided for a principal investment of between $100,000 and $300,000, and a return of between $100,000 and $500,000, with interest at the rate of 50% for a period of 180-days (the "RGT/SSG Promissory Note"). The RGT/SSG Promissory Note also contained a personal guarantee by Wolfe in the event that RGT failed to pay SSG as promised. Pl. Exh. 8.

[16]Castro denied this and testified that he "figured that [Stirton] would be more comfortable funneling [the funds] into something of mine because of what we had in terms of our relationship, rather than sending it directly to someone that was new, that we just didn't know much of." Tr. Day 3 at 135:8-20.

-11-

funds were subsequently transferred from SSG's bank account to RGT.[17]  Tr. Day 3 at 45:6-15; 136:18-138:8; Def. Exh. O.

In July of 2013, Stirton caused Bonita to wire an additional $50,000 to SSG's bank account (the "Second Investment").  Tr. Day 1 at 82:4-17; 93:2-8; Pl. Exh. 10(1).  Castro testified that the funds were intended to go to an entity called Labyrinth Technologies for the development of securities market-predicting software that RGT was interested in leasing.[18]  Tr. Day 2 at 204:11-14; Tr. Day 3 at 151:13-152:4; 154:16-22.  While the evidence at trial was clear that the $50,000 was transferred out of SSG's account, it was never established where the funds actually went.[19]

---

[17]$220,000 was the total amount actually transferred to RGT. $125,000 of that amount were the funds invested by Stirton and $95,000 of that amount were funds provided by an individual named Richard Wright.  Tr. Day 3 at 139:17-22.

[18]Castro testified that after the First Investment, Stirton contacted Castro and said that Bonita had an additional $50,000 to invest.  Castro testified that he shared the Labyrinth investment opportunity and Stirton indicated his intent to invest.  Tr. Day 3 at 156:2-157:1.  Initially, Stirton testified that he was not told that Bonita would be investing in Labyrinth and assumed that the additional $50,000 was to go to the First Investment, and not a different/new investment.  Later in his testimony, he acknowledged that he may have been told that the Second Investment was going to Labyrinth and he may have simply assumed the funds were going to RGT.  Tr. Day 1 at 82:9-17; 88:1-90:4; 98:25-99:2; Tr. Day 2 at 10:1-10; 11:4-12:20.

[19]Castro testified that a woman named Alma Perez was Labyrinth's principal and that Labyrinth did not have an account, thus Wolfe (who was "working in conjunction with Alma Perez") instructed Castro to send the funds to an entity called Forex Capital Markets.  Castro further testified that he believed that the funds ultimately went from Forex to an entity called ATC Brokers, who was "communicating with" Labyrinth.  Tr. Day 2 at pp. 208-214, generally; 218:6-219:6; Tr. Day 3 at 45:16-22;

-12-

At Stirton's request, the First Investment and Second Investment were memorialized by two separate promissory notes, both dated July 17, 2013, and executed by Castro on behalf of SSG on one hand, and Stirton, on behalf of Bonita, on the other (the "Promissory Notes").[20]  Pl. Exhs. 6, 7 and 9; Tr. Day 1 at 82:24-83:1; Tr. Day 2 at 15:6-20; 17:17-25.  The Promissory Note documenting the First Investment provided for a return of 15-20%, payable 180 days following the date of the note.[21]  Pl. Exh. 6. The Promissory Note documenting the Second Investment provided for a return of 5-10%, payable 90 days following the date of the Promissory Note.  Pl. Exh. 9.  Stirton testified that he read through the Promissory Notes prior to signing them, but that "a lot of this seemed like language that I didn't get, to be honest," and "at the time – well, I thought they were, I mean, ridiculous. . . . I thought they were not written as well as

155:2-12; Tr. Day 4 at 44:3-45:7; Pl. Exh. 13.  While a copy of an email from Castro directing Corporate Nevada to transfer the funds to Forex was introduced at trial, no cancelled check was ever produced to show that the funds were received by Forex and nothing was produced to indicate that ATC Brokers ever held the funds.  See generally, Tr. Day 3 at pp. 189-195; pp. 202-03; Tr. Day 4 at pp. 29-32; Pl. Exh. 13(1)-(3).

[20]The Promissory Notes were modeled after the RGT/SSG Promissory Note.  Tr. Day 2 at 36:2-6; Pl. Exh. 8.  An important difference, however, is that the RGT/SSG Promissory Note specifically provided that Wolfe personally guaranteed the debt to SSG.  Pl. Exh. 8.  The Promissory Notes between SSG and Bonita contained no personal guaranty by Castro.  Pl. Exhs. 6 and 9. Stirton admitted at trial that he was able to review the RGT/SSG Promissory Note prior to causing Bonita to transfer funds to SSG. Tr. Day 2 at 28:15-25.

[21]Stirton testified that despite the terms of the Promissory Note, he wasn't actually expecting a rate of return in the 15-20% range.  Tr. Day 1 at 84:1-18.

-13-

might be done[, but I signed them because] I received assurance from [Castro] that this was valid." Tr. Day 1 at 86:5-8; Tr. Day 2 at 37:10-19.

Castro testified that in November 2013, he began calling and exchanging emails with Wolfe regarding the status of the First Investment. He further testified that Wolfe's lack of responsiveness led Castro to suspect that there were going to be issues with repayment. Tr. Day 3 at 170:17-171:6. Wolfe allegedly assured Castro that everything was fine. Tr. Day 3 at 171:7-172:2. Unfortunately, things were not fine and despite informal attempts by Castro to collect, RGT and Wolfe never paid the RGT/SSG Promissory Note. Tr. Day 3 at pp. 173-185; Def. Exh. V. As a result, SSG was unable to repay the First Investment.

Castro also testified that at some point, he contacted Alma Perez about the status of the Second Investment and was told by Perez that it had lost money.[22] Thereafter, Castro requested that ATC Brokers transfer what was left of the $50,000 back to SSG's account. Tr. Day 3 at 45:23-46:2; Tr. Day 4 at 58:20-59:2. Of the $50,000 Second Investment, however, only approximately $36,000 was returned to SSG. Tr. Day 3 at 46:6-8. Subsequently,

---

[22]Castro testified that Alma Perez explained that there had been a "computer glitch" and she forgot to turn off a "signal" and, as a result, $14,000 of the $50,000 Second Investment had been lost. The court has no idea what this means and it is clear that Castro did not know, either. Tr. Day 2 at 217:7-16. Castro testified that he has never received an accounting from Labyrinth, ATC or anyone else showing definitively what happened to the $50,000. Tr. Day 3 at 30:8-25. At trial, Plaintiffs' counsel surmised that Alma Perez may have taken the $14,000 as a fee or commission, but there was no evidence presented to support that theory. Tr. Day 4 at 34:3-37:4.

-14-

Castro caused SSG to transfer approximately $32,000 from SSG's account to Bonita's account.  Pl. Exh. 17(2)-(3); Tr. Day 3 at 46:9-13.  Castro testified that the $4,000 difference between the $36,000 returned to SSG by ATC Brokers and the $32,000 SSG ultimately paid to Bonita was the result of Corporate Nevada paying renewal fees and past-due fees on SSG's behalf, and reimbursing Bay Valley Realty for funds it had previously advanced to SSG.[23]  Tr. Day 3 at 46:14-47:11.  Castro further testified that he attempted to return the remaining $4,000 to Bonita, but never did.  Tr. Day 3 at 47:13-48:15.

As of the date of trial, Bonita had not been repaid any of the $125,000 First Investment and had only been repaid $32,000 of the $50,000 Second Investment.

## III.  Non-Dischargability, in General

The central purpose of the Bankruptcy Code is to permit a deserving debtor to make peace with creditors and obtain a fresh start, free of pre-existing debt.  Grogan v. Garner, 498 U.S. 279 (1991).  The bankruptcy discharge provides this fresh start. Because an exception to discharge impairs a debtor's fresh start, however, the limits on dischargability of debts contained in section 523 are construed strictly against creditors and in favor of debtors.  Ghomeshi v. Sabban (In re Sabban), 384 B.R. 1, 5 (9th Cir. BAP 2008) (citing Klapp v. Landsman (In re Klapp), 706

---

[23]Castro testified that it was his understanding that Corporate Nevada had authorization to automatically deduct fees from any available funds in SSG's account.  Tr. Day 3 at 131:4-17.  He further testified that he didn't realize that Corporate Nevada was going to be taking funds out of the $36,000 that was returned by ATC Brokers to SSG, to pay SSG's outstanding obligations.  Tr. Day 3 at 47:3-16.

-15-

F.2d 998, 999 (9th Cir. 1983); <u>Snoke v. Riso (In re Riso)</u>, 978 F.2d 1151, 1154 (9th Cir. 1992); <u>Beaupied v. Chang (In re Chang)</u>, 163 F.3d 1138, 1140 (9th Cir. 1998)). While a central purpose of bankruptcy is to allow an honest but unfortunate debtor a fresh start, however, "a dishonest debtor . . . will not benefit from his wrongdoing." <u>Apte v. Japra (In re Apte)</u>, 96 F.3d 1319, 1322 (9th Cir. 1996) (citing <u>Grogan v. Garner</u>, 498 U.S. at 286-87).

In an action to determine the dischargability of a debt under Bankruptcy Code § 523(a), plaintiff has the burden of proving all elements of the claim for relief asserted by a preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. at 291.

**IV. Section 523(a) Threshold Question**

Bankruptcy Code § 523(a) provides that "A discharge under section 727 . . . of this title does not discharge an individual from any debt... ." 11 U.S.C. § 523(a). A "debt" is defined as a "liability on a claim." 11 U.S.C. § 101(12). A "claim" is a "right to payment. . . ." 11 U.S.C. § 101(5). A "right to payment" is "nothing more nor less than an enforceable obligation." <u>Johnson v. Home State Bank</u>, 501 U.S. 78, 83 (1991) (citation omitted). Inherent in, and underlying § 523(a) is the assumption that in order for a debt to be determined to be nondischargable as to a debtor, the debt must be enforceable against that debtor. Here, the court finds that neither the First Investment nor the Second Investment are enforceable against Castro.

As an initial matter, the court acknowledges that the Promissory Notes themselves are not entirely clear regarding

-16-

whether the obligor was SSG, Castro, or both.  However, it
becomes evident that SSG was intended to be the sole obligor on
the Promissory Notes when viewed in light of the parties'
actions, the history of the parties' previous transactions and
Stirton's testimony at trial.

First, Bonita wired the funds for the First Investment and
Second Investment to SSG's bank account; not to Castro's
individual account.

Second, the Promissory Notes were modeled after the RGT/SSG
Promissory Note, with the critical distinction that the
Promissory Notes did not contain a personal guarantee by Castro.
Stirton admits to having seen the RGT/SSG Promissory Note that
contained Wolfe's personal guarantee before making the First
Investment.  He also admits to having read the Promissory Notes.
Yet, he never requested that the Promissory Notes be amended to
include a personal guarantee by Castro.  If he really believed
that Castro was personally liable or intended to be personally
liable on the First and Second Investments, it seems apparent
that he would have requested such an amendment.

Third, Stirton testified that he formed Bonita at Castro's
suggestion, and ran his investments through Bonita as a way of
shielding himself from personal liability.  It is not credible
that Stirton believed that Castro was not using his own limited
liability company to shield himself from liability while advising
Stirton to do the same thing.

Fourth, none of the previous flipping projects Stirton had
participated in were structured between individuals; instead they
were all structured between Bonita and the respective LLCs of Bay

-17-

Valley's realtors. Thus the historical pattern contradicts the theory that the First Investment and Second Investment were with Castro individually.

Fifth, Stirton testified at trial that he understood that the First Investment and the Second Investment and the Promissory Notes were between Bonita and SSG. See Tr. Day 1 at 67:14-69:10; 185:21-23; Tr. Day 2 at 15:6-20; 17:17-25; Pl. Exh. 4.

Finally, the court notes that SSG is a Nevada limited liability company. As a general proposition, under Nevada law, unless otherwise provided in the articles of incorporation or a signed agreement, "no member or manager of any limited-liability company formed under the laws of [Nevada] is individually liable for the debts or liabilities of the company." Nev. Rev. Stat. Ann. § 86.371 (West 2016). Members or managers may incur liability for the debts or liabilities of a Nevada LLC, however, if "alter ego" liability is established. See Webb v. Shull, 270 P. 3d 1266, (Nev. 2012) ("We . . . assume, without deciding, that the [alter ego] statute applies[.]"); Montgomery v. eTreppid Technologies, LLC, 548 F.Supp.2d 1175, 1180-81 (D.Nev.2008) (recognizing that federal and state courts have consistently applied to LLCs corporate laws for piercing the corporate veil under the alter ego doctrine); In re Giampietro, 317 B.R. 841, 845-46 (Bankr.D.Nev.2004) (recognizing that whether the alter ego/corporate veil doctrine applies to LLCs in Nevada is a question of first impression).

To establish alter ego liability in Nevada, the following elements must be proved: (1) the LLC must be influenced and governed by the person asserted to be its alter ego; (2) there

-18-

must be such a unity of interest and ownership that one is inseparable from the other, and (3) the facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice.[24] <u>In re Giampietro</u>, 317 B.R. at 848. Unfortunately, in preparing for and conducting the trial, Plaintiffs assumed that Castro was personally liable and failed to even pursue, let alone prove, an alter ego theory of liability.

For all the foregoing reasons, the court finds that Plaintiffs failed to carry their burden of proving by a preponderance of the evidence that Castro was personally liable for the debts created by the First Investment and Second Investment. As a result, the court finds that § 523(a) does not apply and the debts owed to Plaintiffs as a result of the First Investment and Second Investment are dischargeable.

**V.  Section 523(a)(2)(A)**

Assuming solely for the sake of argument and completeness of the record that the debts owed to Plaintiffs are debts owed by Castro personally, the court turns next to Plaintiffs' argument that the debts are nondischargable as debts obtained by "false pretenses, a false representation, or actual fraud[.]" 11 U.S.C. § 523(a)(2)(A). In the Ninth Circuit, the terms "false pretenses" and "false representation" have the same meaning in § 523(a)(2)(A) as the term "actual fraud" and do not provide an

_____

[24]To the extent that California law is the relevant law to determine alter ego liability, it is similar in all material respects to Nevada's. <u>See</u>, Cal. Corp. Code § 17703.04(a) and (b) (West 2016); <u>Walsh v. Kindred Healthcare</u>, 789 F. Supp 2nd 1073, 1082 (N.D. Cal. 2011).

-19-

independent basis for finding a debt nondischargeable.  See Mandalay Resort Group v. Miller (In re Miller), 310 B.R. 185, 199-202 (Bankr. C.D. Cal. 2004) (analyzing the history of the use of these terms in bankruptcy law); See also, Schneider v. Jagar (In re Jagar), 2015 WL 4327902, *4 (Bankr. N.D. Cal., July 15, 2015) (citing In re Miller with approval).

To demonstrate that a debt is nondischargable under § 523(a)(2)(A), Plaintiffs must establish by a preponderance of the evidence: (1) misrepresentation, fraudulent omission or deceptive conduct by Castro; (2) Castro's knowledge of the falsity or deceptiveness of his statement or conduct; (3) Castro's intent to deceive; (4) justifiable reliance by Plaintiffs on Castro's statement or conduct; and (5) damage to Plaintiffs proximately caused by their reliance on Castro's statement or conduct.[25] Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010) (citations omitted); Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 35 (9th Cir. BAP 2009) (citations omitted).  A claim may also arise from the concealment or intentional non-disclosure of material facts.  In re Jagar, 2015

---

[25]Following the trial in the matter, but prior to the issuance of this Memorandum Decision, the Supreme Court issued its decision in Husky Int'l Elecs., Inc. v. Ritz, 2016 WL 2842452 (U.S., May 16, 2016), holding that despite the limited definition given by lower courts, the term "actual fraud," as used in 11 U.S.C. § 523(a)(2)(A) encompasses fraudulent conveyance schemes, even when those schemes do not involve a false representation. This court interprets the Husky Int'l Elecs., Inc. holding to simply expand the scope of acts that support a finding that a debt is nondischargable under § 523(a)(2)(A) to include fraudulent conveyance schemes.  Because no fraudulent conveyance scheme has been asserted and no evidence of such a scheme was produced at trial, the court finds Husky Int'l Elecs., Inc. to have limited, if any, relevance here.

-20-

WL 4327902 at *3 (citations omitted).  Castro's knowledge and
intent to deceive may be inferred by circumstantial evidence and
from his conduct.  Tallant v. Kaufman (In re Tallant), 218 B.R.
58, 66 (9th Cir. BAP 1998).  A claim under § 523(a)(2)(A)
requires Plaintiffs to prove that the critical misrepresentation,
concealment or non-disclosure that they relied upon existed at or
before the moment in time when Plaintiffs transferred the First
Investment and Second Investment funds to Castro.  In re Jagar,
2015 WL 4327902 at *3 (citing, Reingold v. Shaffer (In re
Reingold), 2013 WL 1136546, *5 (9th Cir. BAP, March 19, 2013);
New Falls Corp. v. Boyajian (In re Boyajian), 367 B.R. 138 (9th
Cir. BAP 2007)).

     Here, Plaintiffs did not come close to proving any of the
elements of the § 523(a)(2)(A) cause of action by a preponderance
of the evidence.  Of critical importance, Plaintiffs were unable
to articulate any misrepresentations (knowing or otherwise),
fraudulent omissions, or deceptive conduct by Castro when the
First Investment and Second Investment were made.  When
questioned on the topic, it became clear that Stirton relied
solely on his own assumptions about what background information
Castro had, what the investments were, how they would work, and
their chances for success.  See Tr. Day 1 at pp. 176-184,
generally; Tr. Day 2 at pp. 40-49, generally.  And when
specifically questioned by the court regarding what information
Castro knew at or before the time of the First Investment and
Second Investment that, had he disclosed, would have caused
Stirton or Bonita not to make the investments, Stirton simply
testified, "I can't say that there's specific information."  Tr.

-21-

Day 2 at 48:13-49:14; See also, Tr. Day 1 at pp. 181-182.  As a result, the court was left with the distinct impression that Stirton failed to ask any questions at all.  Ultimately, Stirton's laissez-faire attitude and complete lack of curiosity about where the $175,000 would be going ensured that Castro never had to make any representations, true or otherwise.  Stirton appears to have relied solely and blindly on the success of the previous flipping transactions, apparently in an attempt to remain in Castro's good graces so that he would be offered flipping opportunities in the future.  Because Plaintiffs were unable to articulate any misrepresentations, fraudulent omissions and/or deceptive conduct by Castro at or before the First Investment and Second Investment, the entire cause of action must fail.[26]

## VI.  Section 523(a)(4)

Again, assuming solely for the sake of argument and completeness of the record that the debts owed to Plaintiffs are debts owed by Castro personally, the court turns next to Plaintiffs' argument that the debts owed by Castro are nondischargable as debts that arose from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

/ / / /

---

[26]The court notes that the remainder of the required § 523(a)(2)(A) elements are premised on the existence of a misrepresentation, fraudulent omission or deceptive conduct. Because Plaintiffs failed to establish this threshold element, Plaintiffs also necessarily failed to establish the remaining elements.

-22-

***a.      Fraud or Defalcation While Acting in a Fiduciary
          Capacity***

To prevail on a nondischargability claim under this section,
Plaintiffs must prove not only Castro's fraud or defalcation, but
also that Castro was a fiduciary to Plaintiffs when he committed
the fraud or defalcation. <u>Utnehmer v. Crull (In re Utnehmer)</u>,
499 B.R. 705 (9th Cir. BAP 2013) (citing <u>Otto v. Niles (In re</u>
<u>Niles)</u>, 106 F.3d 1456, 1459 (9th Cir. 1997)); <u>Honkanen v. Hopper</u>
<u>(In re Honkanen)</u>, 446 B.R. 373, 378 (9th Cir. BAP 2011)
(citations omitted).

Under non-bankruptcy law, the definition of "fiduciary" is a
broad one, involving trust, confidence and good faith. <u>Ragsdale</u>
<u>v. Haller</u>, 780 F.2d 794, 796 (9th Cir. 1986) (citations omitted).
That broad definition, however, is inapplicable in the
nondischargability context.  <u>Id.</u>  For purposes of § 523(a)(4),
the Ninth Circuit has adopted a narrow definition of "fiduciary"
as a relationship "arising from an express or technical trust
that was imposed before, and without reference to, the wrongdoing
that caused the debt[.]" <u>In re Honkanen</u>, 446 B.R. at 378-79.

While the scope of the term "fiduciary capacity" is a
question of federal law, the Ninth Circuit considers state law to
ascertain whether the requisite trust relationship exists.  <u>In re</u>
<u>Honkanen</u>, 446 B.R. at 379 (citations omitted).  "For a trust
relationship under § 523(a)(4) to be established, the applicable
state law must clearly define fiduciary duties and identify trust
property. . . . The mere fact that state law puts two parties in
a fiduciary-like relationship does not necessarily mean it is a
fiduciary relationship within 11 U.S.C. § 523(a)(4)." <u>In re</u>

-23-

Honkanen, 446 B.R. at 379 (internal citations omitted). If state

law does not "clearly and expressly impose trust-like obligations

on a party, courts will not assume that such duties exist and

will not find that there was a fiduciary relationship." Houng v.

Tatung Co., Ltd. (In re Houng) 2016 WL 145841, *1 (9th Cir., Jan.

11, 2016) (internal citations omitted); Double Bogey, L.P. v.

Enea, 794 F.3d 1047, 1050 (9th Cir. 2015) (citations omitted).

Here, Plaintiffs first argue that a fiduciary relationship

existed between Plaintiffs and Castro because Castro testified

that it did. This argument is nonsense. Castro was clearly not

qualified to testify as to whether his relationship with

Plaintiffs satisfied the legal definition of "fiduciary."

Further, even if he were qualified to testify in this manner,

Castro's testimony that Stirton trusted him and had confidence in

him falls well short of the legal definition.

Plaintiffs next argue that a fiduciary relationship existed

between Plaintiffs and Castro by virtue of Castro's real estate

license. This allegations misstates the law and the facts.

In California, a real estate licensee does not meet the

fiduciary capacity requirement of § 523(a)(4) solely based on his

status as a real estate licensee. In re Honkanen, 446 B.R. at

381. Instead, fiduciary obligations only attach when a licensee

is carrying out "licensed activities." In re Briles, 228 B.R.

462, 467 (Bankr. S.D. Cal. 1998); In re Rodriquez, 196 B.R. 537,

542 (N.D. Cal. 1996). As relevant here, "licensed activities"

include "solicit[ing] borrowers or lenders for or negotiat[ing]

loans or collect[ing] payments or perform[ing] services for

borrowers or lenders or note owners *in connection with loans*

*secured directly or collaterally by liens on real property[.]"* Cal. Bus. & Prof. Code § 10131(d) (emphasis added). Castro was not carrying out "licensed activities" as defined by Cal. Bus. & Prof. Code § 10131(d) because the First Investment and Second Investment were not secured by (or proposed to be secured by) any liens on real property. In fact, despite knowing very little about the investments, Stirton acknowledges that he did know that they were not intended to be nor were they actually secured by liens on real property. Tr. Day 1 at 185:14-188:7. Thus, Castro's activities do not fall within the scope of "licensed activities" under California law, no fiduciary relationship existed between Plaintiffs and Castro. As a result, this cause of action fails.

### b. *Embezzlement*

Federal law controls the definition of embezzlement for purposes of § 523(a)(4). First Delaware Life Ins. Co. v. Wada (In re Wada), 210 B.R. 572, 576 (9th Cir. BAP 1997) (citations omitted). Embezzlement is defined as the "fraudulent appropriation of property by a person to whom such property has been [e]ntrusted or into whose hands it has lawfully come." Transamerica Commercial Financial Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th Cir. 1991) (citing Moore v. United States, 160 U.S. 268, 269 (1885)). In the nondischargability context, embezzlement requires proof by a preponderance of the evidence of: (1) property rightfully in the possession of a nonowner; (2) the nonowner's appropriation of the property to a use other than that for which it was entrusted; and (3) circumstances indicating fraud. In re Littleton, 942 F.2d at

-25-

555 (citations omitted).  It does not require the existence of a fiduciary relationship.  <u>In re Littleton</u>, 942 F.2d at 555 (citations omitted).

Here, there was clearly no embezzlement of the $125,000 First Investment as the evidence at trial showed that: (1) Plaintiffs gave Castro the funds for the purpose of investing in RGT; and (2) Castro actually did transfer the funds to RGT. Thus, as to the First Investment, there was no proof of misappropriation of funds and the cause of action for embezzlement fails.

Regarding the $50,000 Second Investment, the court acknowledges that the circumstances surrounding this investment are bizarre and that Castro's story regarding where the funds went, why, and what happened to them, is fairly unbelievable. Having said that, it was Plaintiffs' burden to prove embezzlement and they failed.

First, as to the initial transfer of the $50,000 from SSG's account to Forex Capital Markets, it is clear from Stirton's testimony that while he transferred the funds to SSG willingly, he had no understanding at all of what the $50,000 was to be used for.  He apparently made little, if any, inquiry prior to transferring the funds to SSG's account and, at trial, could not testify consistently regarding what he thought he was causing Bonita to invest in.  Stirton presented no written agreement regarding the ultimate destination for the $50,000 and the promissory note documenting the Second Investment (which was prepared at Stirton's request and reviewed by him before he signed it), was similarly silent regarding the anticipated use

-26-

for the funds. Plaintiffs can hardly complain that the funds were used for something other than the intended purpose when there was no understanding of or agreement (written or otherwise) about the intended purpose. Thus, Plaintiffs failed to sustain their burden to show misappropriation by a preponderance of the evidence.

Plaintiffs also failed to sustain their burden to show circumstances indicating fraud by a preponderance of the evidence. As articulated at trial, the court was left with the impression that Castro was enamored with Wolfe and the appearance of Wolfe and RGT's legitimacy and the prospect of healthy returns on investment. Put simply, he appears to have been a shill for Wolfe's apparently-fraudulent activity. But there is no evidence that he actually participated in the fraud or even knew about it until well after the fact.

Plaintiffs also argue rather vaguely that Castro's failure to trace the $50,000 supports a finding of embezzlement. Plaintiffs apparently want the court to conclude that because it is unclear where the funds went, Castro must have committed some wrongdoing sufficient to support nondischargability. Unfortunately for Plaintiffs, that is not the way the law works. The burden was on Plaintiffs to prove all of the elements of this cause of action. Plaintiffs cited, and the court can find, no case law that dictates otherwise. Plaintiffs could have subpoenaed bank records and witnesses in an attempt to prove that Castro had misappropriated all or a portion of the $50,000. They failed to do so. Because Plaintiffs failed to prove embezzlement, the cause of action must fail.

-27-

Finally, the fact that $36,000 of the $50,000 was returned to SSG's account and $32,000 of that amount was subsequently returned to Bonita requires the court to consider whether Castro "embezzled" the approximately $4,000 that he failed to return to Bonita. The court finds that he did not.

The record shows that when Castro learned that $14,000 of the $50,000 had been lost, he requested that the remaining $36,000 be returned. The $36,000 was returned to SSG's account and Castro instructed Corporate Nevada to forward those funds to Bonita. Ultimately, however, only $32,000 was transferred to Bonita as Castro testified that Corporate Nevada had taken $4,000 to pay outstanding fees owed by SSG and to reimburse Bay Valley Realty for funds it had previously advanced to SSG. Castro testified that it was his understanding that Corporate Nevada had authorization to automatically deduct fees from any available funds in SSG's account. He further testified that he did not realize that Corporate Nevada would be taking funds out of the $36,000. Finally, he testified that he tried to return the outstanding $4,000. All of this testimony went unchallenged. Thus, while the first two elements for embezzlement were arguably satisfied, the requirement to show circumstances indicating fraud, was not. Again, Plaintiffs could have challenged this testimony. They could have called witnesses from Corporate Nevada. They could have produced the agreement between Corporate Nevada and SSG. They did not. As a result, they failed to meet their burden of proving embezzlement by a preponderance of the evidence.

/ / / /

-28-

### c.  *Larceny*

Federal law also controls the definition of larceny for purposes of § 523(a)(4).  <u>Ormsby v. First American Title Company of Nevada (In re Ormbsby)</u>, 591 F.3d 1199, 1205 (9th Cir. 2010).  Larceny is defined as a "felonious taking of another's personal property with intent to convert it or deprive the owner of the same."  <u>Id.</u> (citations omitted).  Larceny is distinguished from embezzlement in that the original taking of the property was unlawful.  <u>In re Quinones</u>, 537 B.R. 942, 950 (Bankr. N.D. Cal. 2015) (citing <u>In re Montes</u>, 177 B.R. 325, 332 (Bankr. C.D. Cal. 1994)).

Here, there was no unlawful taking of Plaintiffs' property.  Plaintiffs gave the First Investment and Second Investment funds to SSG and/or Castro freely.  Thus, Plaintiffs have not and cannot establish larceny by a preponderance of the evidence.

## VII. Section 523(a)(6)

In their Post-Trial Brief, Plaintiffs effectively dismissed or withdrew the § 523(a)(6) cause of action, acknowledging that it is "unnecessary and untenable."  As a result, the court will not address the cause of action.

## VIII. Conclusion

For all of the foregoing reasons, the court finds that Plaintiffs failed to carry their burden of proving by a preponderance of the evidence that: (1) Castro was personally liable to Plaintiffs on the First Investment and Second Investment; (2) the debts resulting from the First Investment and Second Investment were debts obtained by false pretenses, a false representation or actual fraud as required by § 523(a)(2)(A); and

-29-

(3) the debts resulting from the First Investment and Second
Investment were debts that arose from fraud or defalcation while
acting in a fiduciary capacity, embezzlement, or larceny as
required by § 523(a)(4). As a result, the debts resulting from
the First Investment and Second Investment are dischargable.
Judgment shall be entered in favor of Defendant.

**\* \* \* End of Memorandum Decision \* \* \***

Case: 14-04115   Doc# 50   Filed: 10/07/16   Entered: 10/07/16 15:27:25   Page 30 of 31

**<u>Court Service List</u>**

No Court Service Required

-31-